IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

IN RE: K. REX MAYFIELD, Debtor                                  No. 6:16-bk-71819
                                                                Ch. 13

**OPINION AND ORDER GRANTING MOTION TO DISMISS**

On August 4, 2016, K. Rex Mayfield [the debtor] filed the above-captioned chapter 13 bankruptcy case. On September 28, 2016, the debtor's ex-wife, Suzanne Mayfield [Mayfield] filed a motion to dismiss the debtor's case for cause and on November 16, 2016, filed a motion for relief from stay. The Court held a hearing on Mayfield's motions on November 29, 2016. Sherry Daves appeared on behalf of the debtor; Marc Honey appeared on behalf of Mayfield. At the conclusion of the hearing, the Court took the motions under advisement. For the reasons stated below, the Court grants Mayfield's motion to dismiss, rendering her motion for relief from stay moot.

## Background

After approximately 19 years of marriage, the debtor and Mayfield divorced on June 30, 2015. On that date, the parties entered into an agreement approved by the Domestic Relations Division of the Garland County Circuit Court [state court or court] and memorialized in a decree of divorce [consent decree or decree]. The consent decree provided, in relevant part, that

> The Defendant [debtor] shall keep as his sole and separate property the real property and improvements located at 290 Scroggins Terrace, Hot Springs, AR 71901 and shall pay to the Plaintiff [Mayfield] the sum of $125,000.00 within 120 days of this Decree. Defendant shall be responsible for all real property taxes due for 2014 and thereafter and any other debt associated with said property. Plaintiff agrees to execute a quitclaim deed upon full payment of monies for her share in the real property.

Jt. Ex. 5. Despite the parties' agreement, the debtor did not pay Mayfield $125,000.00 within 120 days of the decree, leading Mayfield to file a motion for contempt in state

court. On May 10, 2016, the state court found that the debtor had not complied with the terms of the consent decree. To enforce the decree, the court ordered that

> 3. The real property and improvements located at 290 Scroggins Terrace, Hot Springs, Arkansas 71901 shall be placed for public auction on August 9, 2016 or as soon thereafter as it is convenient to the Circuit Clerk.
>
> 4. The Circuit Clerk shall sell the home to the highest bidder subject to a down payment of 10% with the balance being paid within ninety (90) days and shall thereafter make a report to the Court and seek confirmation of the sale.

Jt. Ex. 6. The state court's May 10 order provided that after deducting the costs of the sale, the sale proceeds would be used to pay Mayfield $125,000.00 plus $3100.00 for her attorney fees, with any remaining proceeds belonging to the debtor. The Court has no evidence to suggest that the debtor appealed the state court's May 10 order. On August 4, 2016–five days prior to the auction–the debtor filed this chapter 13 case, thus invoking the automatic stay and, as a result, suspending the sale.

On September 16, 2016, the debtor filed his schedules, statements, and plan. In his schedules, the debtor stated a monthly income of $7093.03, derived largely from the debtor's telecommunications consulting business. The debtor stated expenses of $3137.00, including $836.00 for monthly charitable contributions. Based on his stated income and expenses, the debtor had a monthly surplus of $3956.03 on the date that he filed his petition,[1] but proposed a monthly plan payment of $600.00. He scheduled no secured debt encumbering the Scroggins Terrace property [the property]. The debtor valued the property at $285,000.00 and claimed an exemption in the same amount pursuant to Arkansas law.[2] The debtor proposed in his plan "to sell the real property located at 290 Scroggins Ter in Hot Springs, AR within six months for the fair market value of not less than $285,000.00 and pay unsecured creditor, Suzanne Mayfield, her

---

[1] The debtor amended his schedules on November 28, 2016, to reflect a monthly alimony payment of $600.00 to Mayfield, changing his monthly surplus to $3356.03.

[2] The debtor's claimed exemptions drew no objections.

2

claim of $125,000.00 in full." He did not, however, propose to pay Mayfield her attorney fees of $3100.00 as ordered by the state court in its May 10 order. The debtor's amended schedules filed on November 28, 2016, reflected that in addition the debt owed to Mayfield, the debtor owes an unsecured debt of $3850.00 for a personal loan and an unsecured priority debt of $9600.00 to the Internal Revenue Service [IRS].[3] The plan proposed to pay all unsecured creditors in full.

On September 28, 2016, Mayfield moved to dismiss the debtor's case under 11 U.S.C. § 1307(c), alleging that the debtor filed his bankruptcy case in bad faith. On November 16, 2016, Mayfield filed her motion for relief from stay, asserting that the automatic stay does not apply to domestic support obligations under 11 U.S.C. § 362(b)(2).[4] Alternatively, Mayfield argues that the Court should grant relief from the stay under § 362(d) to allow her to return to state court and seek the enforcement of that court's previous order mandating the sale of the property at auction and the payment of her debt from the proceeds.

At the November 29 hearing, Mayfield testified that she works at a discount store and receives alimony payments of $600.00 per month from the debtor. Mayfield currently lives in a rented apartment and testified that the purpose of the $125,000.00 was to

---

[3] The Court takes judicial notice of the proof of claim filed by the IRS on August 24, 2016, in the amount of $44,767.76 and the amended claim filed by the IRS on November 30, 2016, in the amount of $44,140.58, asserting that the debtor owes the IRS a priority unsecured debt of $27,949.76 and an unsecured debt of $16,190.82. *See* Fed. R. Evid. 201 (a court may take judicial notice of certain facts on its own at any stage of a proceeding); *see also In re Henderson*, 197 B.R. 147, 156 (Bankr. N. D. Ala. 1996) (a court may take judicial notice of records in a case before it). The Court also takes judicial notice of the fact that, to date, no additional unsecured creditors have filed claims.

[4] The debtor disagrees with Mayfield's characterization of the $125,000 payment owed to Mayfield as a domestic support obligation, arguing instead that it is a property settlement. Because the Court finds that dismissal is warranted, it need not decide the nature of the debtor's obligation to Mayfield.

provide her with "somewhere to live" and allow her to take care of herself. The debtor acknowledged that he owes Mayfield $125,000.00 and professed a desire to pay her. However, he does not want to pay her in the manner ordered by the state court. The debtor admitted that he filed bankruptcy to prevent the property that he owns free and clear from being auctioned to the highest bidder at the court-ordered sale that was scheduled for August 9. Because the debtor has started but only partially completed renovations on the property, the debtor believes that banking regulations would preclude potential buyers at an auction from obtaining a loan to purchase the property, thereby limiting the pool of bidders to those with the ability to pay cash and forcing a low sale price. He testified that because the state court failed to establish a minimum sale price for the auction, he feared that the property would be sold for less than the $125,000.00 that he was ordered to pay Mayfield. His goal is to sell the property for enough money to allow him to pay Mayfield and his other creditors with money left over.[5]

The debtor testified that he believes that the property is currently worth $185,000.00 based upon an appraisal that he obtained in 2015. However, he also believes that the property will be worth $250,000.00 when he finishes updating the home.[6] The debtor, experienced in construction, testified that before Mayfield moved out of the house "prior to 2013," he personally renovated the kitchen, living room, and dining room. However, the debtor admitted that "not much" work has been done since Mayfield moved out,

---

[5] The debtor testified that in the 60 days after the state court's order, he applied for numerous loans to pay Mayfield but was turned down 38 times. On cross-examination, the debtor admitted that he filled out only five loan applications and further admitted that one lender approved him for a $60,000.00 loan but that he opted not to proceed with borrowing the money. He testified that despite having good credit, he was unable to obtain a loan because he is in the process of renovating the property and was told that "banking regulations" prohibit banks from using property undergoing renovations as collateral.

[6] When pressed on cross-examination about how he arrived at the minimum sale price proposed in his plan of $285,000.00 when he believes the property will be worth $250,000.00 when the renovations are completed, the debtor stated that $285,000.00 is what it would cost him to replace the property if something were to happen to it.

leaving two bedrooms and at least one bathroom in a "demolished" state. Deborah Jones, a realtor called as a witness by the debtor, testified that she first visited the property in 2014, and recalled that some renovations, including the update to the kitchen, were complete at that time. She recommended listing the property for $199,000.00, with the expectation of selling it for $175,000.00 to $185,000.00.[7] When Jones visited the property again two months prior to the November 29 hearing, she found that the renovations were only "a little further along" with several rooms still "torn down to the studs." Jones testified that she did not believe that the minimal renovations that the debtor had undertaken between her first visit to the property in 2014 and her visit in September 2016, such as installing an outdoor shower, had served to increase the value of the property. As a result, she maintained her initial opinion that the property would sell for approximately $185,000.00. She also testified that she believes that the property could potentially sell for $250,000.00 if the entire house were remodeled to match the quality of the renovated kitchen. Jones testified that in order to sell the property for $285,000.00, the property would have to be in "pristine" condition and remodeled to a "high standard." She admitted on cross examination that she does not know if or when the house might be in pristine condition and acknowledged that the property was worth $185,000.00 in September 2016 when the debtor filed a plan proposing to sell the property for no less than $285,000.00. Jones conceded that the debtor appears to have proposed the minimum sale price "not in good faith."

The debtor estimates that it would cost approximately $32,000.00 to purchase the materials that he would need to finish renovating the property and testified that he has the money to pay for the remainder of the materials. He does not believe, however, that it is in his best interest to invest the funds and energy required to complete the renovations unless he knows that he will reap a benefit from the sale. As a result, the debtor did not

---

[7] The Court has no evidence that the debtor has ever listed the property for sale–through Jones or anyone else. Jones did, however, assist the debtor with his purchase of another home approximately two weeks prior to filing his bankruptcy case.

5

resume the renovations when he filed his plan on September 16, nor had he resumed the renovations as of the hearing on November 29.  He estimated that he would need six months from November 29 to complete the renovations and six more months–or longer–to sell the property.  He admitted on cross-examination that when he proposed his plan on September 16 to sell the property within six months, there was "no way" that he could have finished the renovations within that time.

Mayfield agrees with the debtor that a sale of the property on the open market would bring a higher sale price than would a court-ordered auction.  However, she believes that the debtor's lack of progress on the renovations, coupled with his attempt to establish a minimum sale price of $285,000.00, indicates that the debtor does not intend to sell the property at all.  She contends that the debtor filed bankruptcy for the sole purpose of thwarting the state court's order directing the auction of the property.  For these reasons, Mayfield alleges that the debtor filed his petition and proposed his plan in bad faith under § 1325(a)(3) and (a)(7), respectively, and moves the Court to dismiss the case for cause under § 1307(c).  Absent dismissal, Mayfield asks the Court to find that the stay is not applicable to the continuation of her state court action under § 362(b)(2) or find that she established cause to lift the automatic stay under § 362(d)(1).

**Findings of Fact and Conclusions of Law**

In a chapter 13 case, the issue of bad faith arises primarily in two contexts.  First, under § 1307(c), if a debtor files a chapter 13 case in bad faith, the court may convert or dismiss the case "for cause."  *Hansmeier v. McDermott* (*In re Hansmeier*), 558 B.R. 299, 303 (B.A.P. 8th Cir. 2016) (citing *Molitor v. Eidson* (*In re Molitor*), 76 F.3d 218, 220 (8th Cir. 1996)).  Second, in order for a debtor's plan to be confirmed under § 1325, the debtor must have filed his chapter 13 petition in good faith and proposed his plan in good faith.  11 U.S.C. § 1325(a)(3) and (a)(7).  The only substantive difference between a bad faith inquiry for purposes of dismissal under § 1307(c) and a good faith inquiry for purposes of confirmation of a plan under § 1325 lies in the party bearing the burden of proof.  *In re Mattson*, 241 B.R. 629, 635 (Bankr. D. Minn. 1999); *see also In re Goodvin*,

6

548 B.R. 806, 811 (Bankr. N.D. Iowa 2016) ("Bad faith is synonymous with lack of good faith.") Under § 1307(c), the moving creditor bears the burden of proving that the debtor filed his petition in bad faith, while under § 1325(a)(3), a debtor seeking confirmation of a plan bears the burden of proving that he filed his petition in good faith. *In re Mattson,* 241 B.R. at 635 (citing *In re Love*, 957 F.2d 1350, 1355 (7th Cir. 1992)). Although confirmation of the debtor's plan is not before the Court at this juncture, "information contained in the plan may be relevant when determining if the entire proceedings were initiated in good faith." *In re Love*, 957 at 1360. Because § 1307 places the burden of proof on the party moving for dismissal or conversion, Mayfield must prove by a preponderance of the evidence that the debtor filed his case in bad faith in order to prevail on her motion to dismiss.[8]

In the Eighth Circuit, courts examine the totality of the circumstances to determine whether a debtor filed a chapter 13 petition in bad faith. *In re Molitor*, 76 F.3d at 220. Courts generally analyze whether the debtor accurately stated his debts and expenses; whether the debtor has made fraudulent misrepresentations to mislead the Court; and whether the debtor has unfairly manipulated the bankruptcy code. *Id*. Courts also examine the debtor's pre-filing conduct and his motivation and sincerity in seeking chapter 13 relief. *In re Ussery*, 261 B.R. 227, 229 (Bankr. E.D. Ark. 2001). Additional considerations may include whether the debtor has few unsecured creditors, whether the petition allows the debtor to evade a state court order, and whether the debtor filed bankruptcy solely to obtain the protection of the automatic stay. *See In re Klevorn*, 181 B.R. 8, 11 (Bankr. N.D.N.Y. 1995). The "'hallmark of the totality of the circumstances test is that the factors to be considered may vary in each case.'" *In re Goodvin*, 548 B.R. at 811 (quoting *Sullivan v. Solimini* (*In re Sullivan*), 326 B.R. 204, 212 (B.A.P. 1st Cir. 2005)). A determination of bad faith requires a fact-intensive, "multi-faceted analysis that is applied on a case-by-case basis." *In re Sullivan*, 326 B.R. at 212. Therefore, the

---

[8] Mayfield did not move for conversion as an alternative to dismissal and the Court does not believe that conversion is appropriate in this case.

Court will discuss the factors that appear relevant in this particular case.

In evaluating whether the debtor accurately stated his debts and expenses, the Court recognizes that there exists a question regarding whether the debtor accurately stated the amount of his debt to the IRS. On August 24, 2016, the IRS filed a proof of claim in the amount $44,767.76. Approximately three weeks later, on September 16, 2016, the debtor filed schedules stating that he owes a debt of $9600.00 to the IRS. On November 30, the IRS filed an amended proof of claim in the amount of $44,140.58. However, because the disparity could have been resolved by further amendments to the IRS's proof of claim or through claims litigation that may ultimately have proved the debtor's figure to be the correct one, the Court cannot find that the debtor stated the amount of his debt to the IRS inaccurately. Because the Court has no evidence contradicting the accuracy of the other debts or expenses as stated in the debtor's schedules, the Court finds its examination of this particular factor unavailing. However, the absence of a certain factor is not determinative; bad faith is analyzed within a flexible framework dictated by the facts of each case. *See, e.g., In re Rotellini*, 510 B.R. 241, 245 (Bankr. E.D. Mo. 2014) (citing *Handeen v. LeMaire* (*In re LeMaire*), 898 F.2d 1346, 1349 (8th Cir. 1990)).

Although solvency at the time of filing is not necessarily a marker of bad faith, the Court finds that, in this case, the debtor's overall financial condition is relevant to a determination of his motivation and sincerity in seeking chapter 13 relief. Mayfield testified that the debtor has owned a telecommunications consulting business for several years. The debtor's schedules reflect that he has a monthly income of $7093.03. The debtor's most recent schedules, filed on November 28, indicate that after his monthly expenses are paid–including an expense of $836.00 per month for charitable contributions–the debtor has a monthly surplus of $3356.03. Additionally, the debtor testified that he had good credit when he was applying for loans during the 60-day period following the state court's order and also acknowledged that he was able to obtain a loan to purchase a second home only two weeks prior to filing bankruptcy. Viewing the debtor's substantial monthly surplus in concert with his admitted good credit, the Court

8

finds that the debtor was not in financial distress when he filed his chapter 13 petition on August 4. Further, the IRS is the debtor's sole unsecured creditor other than Mayfield. Although the debtor testified that he would like to pay the IRS from the proceeds of the sale of the property, his alleged desire to do so appears to be nothing more than a post-filing afterthought. The debtor's plan does not require him to use any portion of the sale proceeds to pay the IRS and the Court has no evidence to suggest that the debtor's decision to file bankruptcy was based, even in part, on a debt owed to the IRS.[9]

To the contrary, at the November 29 hearing, the debtor testified unequivocally that he filed bankruptcy on August 4 for the purpose of stopping the auction of the property that had been ordered by the state court and was scheduled to take place on August 9. The debtor testified that because the state court did not establish a minimum sale price for the property at auction, he was worried that the property would be auctioned for less than the $125,000.00 he was ordered to pay Mayfield. He also acknowledged the less altruistic–and, the Court believes, predominant–concern that an auction resulting in a low sale price would yield no excess funds for his own use after his debt to Mayfield was satisfied. To remedy his concerns, the debtor filed this case to derail the court-ordered auction and sell the property on terms more favorable to him than those ordered by the state court.[10] However, "bankruptcy rehabilitation provisions are intended to benefit only those in genuine financial distress and are not to be used strategically as an avoidance mechanism to get out of particular obligations viewed by a debtor as having undesirable consequences." *In re Purpura*, 170 B.R. 202, 207 (Bankr. E.D.N.Y. 1994).

---

[9] As discussed previously, the debtor scheduled a debt of $9600.00 to the IRS. The fact that the IRS filed a proof of claim for a higher amount *after* the debtor had already availed himself of chapter 13 relief could not have contributed to the debtor's decision to file bankruptcy in the first place.

[10] Had this case proceeded, the Court would not have had jurisdiction to modify the state court's order pursuant to the *Rooker-Feldman* doctrine. *Rooker-Feldman* is implicated in that subset of cases where the losing party in a state court action subsequently complains about that judgment and seeks review and rejection of it. *Skit Intern, Ltd. v. DAC Tech. of Ark., Inc.,* 487 F.3d 1154, 1156 (8th Cir. 2007).

> The purpose of the Bankruptcy Code is to provide debt relief to debtors who require a "fresh start." It is not a forum to avoid the import of state court decisions or other lawful obligations. *See In re Huckfeldt*, 39 F.3d 829 (8th Cir. 1994); *In re Maras*, 226 B.R. 696 (Bankr. N.D. Okla. 1998); *In re Griffith*, 203 B.R. 422 (Bankr. N.D. Ohio 1996) (case dismissed where it was "clear that the bankruptcy action is merely a continuation of a previously litigated dispute between divorced spouses."); *In re Casey*, 198 B.R. 910 (Bankr. S.D. Cal. 1996) (bad faith exists when the case is filed for the purpose of continuing or collaterally attacking state court litigation between debtor and former spouse); *In re Bandini*, 165 B.R. 317 (Bankr. S.D. Fla. 1994); *Rogers v. Overstreet* (*In re Rogers*), 164 B.R. 382 (Bankr. N.D. Ga. 1994) (case filed in bad faith were [sic] admitted purpose was to circumvent state court obligations). *See also In re Lewis*, 227 B.R. 886 (Bankr. W.D. Ark. 1998).

*In re Banks*, 241 B.R. 434, 437 (Bankr. E.D. Ark. 1999). As the Court discussed earlier, the debtor in the instant case did not file bankruptcy due to financial distress. Instead, by his own admission, the debtor filed his chapter 13 case to evade the consequences of the state court's May 10 order–namely, to stop the auction. Therefore, the Court finds that the debtor's motivation for filing bankruptcy was improper.

Additionally, the debtor proposed in his plan to pay Mayfield her claim of $125,000.00 when he sold the property "within six months" for "not less than $285,000.00." Because the debtor filed his plan on September 16, the six-month period ostensibly began to run on September 16. However, at the hearing, the debtor acknowledged that when he filed his plan, he knew that there was "no way" that the property could even be *ready* to sell within six months due to the incomplete state of the renovations. He admitted that he had worked very little on the renovations for over three years–and did not plan to start unless he knew that he would reap a benefit from the sale. As a result, on November 29, he said that he needed a new six-month period starting on that day to finish the renovations and then an additional six months–or longer–to actually sell the property.[11] Based upon the debtor's testimony, the Court finds that when the debtor proposed on September 16 to sell the property within six months, he knew that it could not occur. In addition,

---

[11] At best, Mayfield would be forced to wait more than two years after the parties' divorce to receive payment.

10

irrespective of the debtor's belief that it would cost him $285,000.00 to replace the property if something happened to it, both the debtor and his realtor testified that the property is currently worth $185,000.00.  Although the debtor testified, and his realtor confirmed, that the property could be worth $250,000.00 if the debtor completed the renovations, the debtor acknowledged that he discontinued the renovations over three years ago, despite his understanding that potential buyers would be unable to obtain financing unless he finished the renovations.  Further, although the debtor believed that the property might sell for $250,000.00 if he completed the renovations, he proposed in his plan to sell the property for no less than $285,000.00–making the *minimum* sale price $35,000.00 higher than he believes the property would bring under his own best-case scenario.  Based upon the debtor's knowingly underestimated time frame for selling the property and the incongruity between his alleged goal of selling the property to pay his creditors and his attempt to establish a minimum sale price so high that it ensured the opposite result, the Court finds that the debtor was not sincere in seeking chapter 13 relief.

**Conclusion**

In sum, the Court finds that the debtor had no legitimate purpose for filing this chapter 13 case.  Against a backdrop of financial stability and few unsecured creditors, the debtor filed this case solely to escape the ramifications of the state court's May 10 order.  The debtor sought chapter 13 relief on August 4 to stop the auction scheduled by the state court for August 9 because the debtor found the terms of the auction unpalatable.  On September 16, he proposed a disingenuous plan to sell the property within a time frame and at a price that he knew were untenable.  Specifically, he proposed to sell the property within six months while knowing that he needed six months just to finish the renovations.  Even after filing a plan that established a six-month window within which to sell the property, the debtor neither listed the property for sale nor worked toward completing the renovations–despite having the funds and ability to do so–because he was unwilling to expend resources on the project without a guarantee that he would receive a portion of the sale proceeds.  By refusing to complete the renovations, he foreclosed the possibility

11

of using the property to secure a loan to pay Mayfield in full and also prevented potential buyers from obtaining financing. By proposing a baseless minimum sale price of $285,000.00 when he knew that the property was worth $185,000.00, he ensured that the property would not sell even if he did eventually complete the renovations. Although the debtor testified that he wants to pay Mayfield what she is owed, his actions indicate otherwise. For all of the above-stated reasons, the Court finds that Mayfield proved by a preponderance of the evidence that the debtor filed this case in bad faith under the totality of the circumstances. Therefore, the Court grants Mayfield's motion to dismiss under § 1307(c) and need not reach the merits of her motion for relief from stay.

IT IS SO ORDERED.

                                                        Ben Barry
                                                       United States Bankruptcy Judge
                                                       Dated: 01/13/2017

cc:       Sherry Daves, attorney for the debtor
            Marc Honey, attorney for Suzanne Mayfield
            Jack W. Gooding, chapter 13 trustee
            Hon. Lynn Williams, Circuit Judge, Garland County, Arkansas